Filed 3/16/15  P. v. Rackley CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FRANK WILLIAM RACKLEY, SR.,<br><br>    Defendant and Appellant. | C072249<br><br>(Super. Ct. No. 12F01582) |

Defendant Frank William Rackley, Sr., forcibly raped C.M. and J.D., whom he picked up under the pretext of paying for sex.  He also forcibly penetrated C.M.'s vagina and anus with his fingers.  A jury convicted defendant of two counts of forcible rape (Pen. Code, § 261, subd. (a)(2))[1] and two counts of forcible sexual penetration (§ 289, subd. (a)(1)).  The jury also found defendant committed an offense specified in section 667.61, subdivision (c), against more than one victim.  (§ 667.61, subd. (e)(4).)  In a bifurcated proceeding, the trial court found defendant was previously convicted of robbery—a serious felony offense (§ 667, subd. (a)) and a strike offense within the

---

[1]    Undesignated statutory references are to the Penal Code.

1

meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d))—and he had served four prior prison terms (§ 667.5, subd. (b)). The trial court sentenced defendant to serve an indeterminate term of 120 years to life in state prison, plus a consecutive determinate term of 21 years, and imposed other orders.

On appeal, defendant contends: (1) the trial court prejudicially abused its discretion when it denied his motion to sever Counts 1 through 3 (rape and sexual penetration of C.M.) from Counts 4 and 5 (rape and oral copulation of J.D.[2]); (2) defense counsel provided constitutionally deficient assistance by failing to request a change of venue; (3) the trial court prejudicially abused its discretion under Evidence Code section 352 when it (a) admitted evidence defendant had a swastika tattoo on his chest, (b) admitted evidence J.D. was 16 years old at the time of the rape, and (c) excluded certain evidence of prior crimes committed by C.M. and J.D.; (4) the trial court prejudicially erred when it denied defendant's motion to dismiss Juror No. 7 after the juror acknowledged he lived in the same neighborhood as a prosecution witness; (5) defendant's constitutional right to trial by jury was infringed because the jury did not begin its deliberations anew after Juror No. 10 was removed and replaced by an alternate juror; and (6) the trial court prejudicially erred when it did not respond to a jury question that was received before the juror substitution.

We disagree with each contention. As we explain, the trial court did not abuse its discretion in denying defendant's severance motion. All counts were properly joined under section 954 and defendant has made no showing of prejudice caused by the joinder. Defendant has not carried his burden of demonstrating his trial counsel was ineffective for declining to request a change of venue. The trial court properly admitted evidence of defendant's swastika tattoo and J.D.'s age at the time defendant raped her, and properly

---

[2] The jury acquitted defendant of the oral copulation charge.

limited admission of evidence of prior crimes committed by C.M. and J.D.  Nor did the trial court abuse its discretion when it denied defendant's motion to excuse Juror No. 7. While the juror revealed to the trial court he lived in the same neighborhood as a prosecution witness, he had no personal relationship with the witness and assured the trial court he could remain fair and impartial.  Defendant's claim the jury failed to begin deliberations anew after Juror No. 10 was replaced by an alternate juror is not supported by the record.  Finally, the trial court was not required to respond to a juror question it received before the juror substitution.  As defendant acknowledges, deliberations were required to begin anew.  We therefore affirm the judgment.  However, having found a clerical error in the abstract of judgment, we direct the trial court to correct the abstract of judgment to correct the error.

FACTS

### *Rape of C.M.* (*Counts 1-3*)

On June 22, 2011, C.M. was working as a prostitute on Watt Avenue in North Highlands.  Around 10:30 p.m., defendant pulled up in a red pickup truck and told her to "get in."  C.M. complied.  Inside the truck, defendant agreed to pay $100 for sex, "basically a quickie," with the understanding he would have to wear a condom.  C.M. then directed defendant to a nearby location to perform the agreed-upon sex act, but they both decided the location was too crowded.  Defendant said he knew of a better place and drove to a secluded parking lot on Roseville Road.  After they parked, C.M. said she would "get naked" as soon as she received her "donation."  Without responding, defendant "jumped" on C.M., pulled her shorts down to her "mid thigh area," and "placed [her] into like a pretzel shape [with her] legs above [her] neck," holding her in that position with one hand as he penetrated her anus and vagina with the other hand. Defendant told C.M. she was "dirty and disgusting," among other insults.  He then informed her that "he wouldn't pay for it anyways" and inserted his penis into her vagina without a condom.  Without consenting to have sex with defendant, C.M. asked him to

3

put on a condom. As she explained: "I was being raped. I didn't want to be raped and come back with HIV or any kind of other disease." Defendant refused, saying he knew she did not have any diseases because she asked him to use a condom.

After the rape, defendant left the truck cab through the passenger side door and walked a short distance away from the truck, where he either ejaculated or urinated on the ground. C.M. described: "I didn't see any fluid come out of him, but there was a shaking movement that he was doing with his hand, and at that time I was pulling my clothes back up as I was looking at him to see if maybe I could run or not run, but I decided not to run." When defendant returned to the truck, he offered to give C.M. a ride, apparently back to the location where he had picked her up on Watt Avenue. She decided to accept the ride, and having noticed defendant had a swastika tattoo on his chest, C.M. used white supremacist slang—"do I have your skin on this"—to ask for his assurance nothing else would happen to her. Defendant responded: "Get the fuck out." C.M. got out. Defendant drove away, leaving C.M. to walk down Roseville Road in search of help. Eventually, she was able to flag down a passing car, the driver of which allowed her to use his cell phone and drove her to a nearby restaurant. A short time later, C.M.'s cousin arrived and drove her to the hospital.

C.M. was interviewed by police at the hospital. She revealed the details of the rape and described her attacker, but lied about working as a prostitute because she did not want to be arrested. C.M. declined to have a rape examination done when she was told the examination would be performed in Roseville. She explained she did not want to go that far for the examination and she did not believe defendant ejaculated inside of her, "so [there would be] no evidence to collect." About a month later, C.M. participated in preparing a composite sketch of the rapist. The sketch included a swastika tattoo on the left side of the rapist's chest and the letters "SAC" tattooed in a semi-circular formation on his stomach.

4

### *Rape of J.D.* (*Count 5*)

On July 22, 2011, J.D. was working as a prostitute on Watt Avenue. She was 16 years old. Around 11:00 p.m., she walked down Auburn Boulevard to Edison Avenue, where defendant pulled up in a red pickup truck. Defendant asked if she was "dating." J.D. said, "yes" and got in the truck. Defendant pulled onto the freeway. When J.D. asked where they were going, defendant told her to "sit back and relax." He then exited the freeway at Fulton Avenue and drove to a "dark area" near Del Paso Country Club. Defendant parked the truck, unzipped his pants, and placed his penis in J.D.'s mouth. She began to cry. Defendant then pulled J.D.'s underwear down and climbed on top of her. He lifted his shirt to his chin, revealing his tattoos, pinned her arms above her head, and then inserted his penis in her vagina. J.D. pleaded with defendant repeatedly, "please don't do this," which he ignored. A few minutes later, defendant ejaculated inside of her. He then removed his penis and said: "[S]hut up, bitch, or I'll slap you."

After the rape, defendant took J.D.'s cell phone and opened the passenger side door. Seeing some of his ejaculate was on the seat, defendant used a receipt that was in the truck cab to wipe it off, and then threw the receipt out the door. J.D. stepped out of the truck and asked for her phone back. Defendant drove off and threw the cell phone out the window a short distance away. After picking up her cell phone, J.D. ran until she came upon a gas station and saw a woman in the parking lot. She told the woman what had happened and was directed to a sheriff's department substation up the street. When J.D. arrived at the substation, she was "hysterical and sobbing." She reported the rape to a deputy in the parking lot and described the rapist, but lied about working as a prostitute because she was "scared [she] would go to jail." Another deputy drove J.D. to the crime scene, where the receipt was collected as evidence. J.D. was then driven to the hospital, where a rape examination was performed.

### Defendant's Identity as the Rapist

Less than a week after he raped J.D., defendant was arrested in a parking lot next to his red pickup truck. The tattoos on defendant's chest and stomach matched those on the composite sketch prepared based on C.M.'s description of the rapist. C.M. also described a small crack in the truck's rear view mirror that matched the truck.

About two months later, C.M. identified defendant in a photo lineup, noting next to his photograph: "[T]his is the man that raped me."

At trial, both C.M. and J.D. identified defendant as the rapist. While C.M. was at first unable to identify anyone in the courtroom as the rapist, a short time later, she stated: "I'd like to take -- take it back. I believe that's the man right here." Identifying defendant, she stated: "Yeah. Yeah. That's the man."

Defendant's DNA also matched that of a sperm fragment collected during J.D.'s rape examination.

## DISCUSSION

## I

### Denial of the Severance Motion

Defendant contends the trial court prejudicially erred when it denied his motion to sever Counts 1 through 3 (rape and sexual penetration of C.M.) from Counts 4 and 5 (rape and oral copulation of J.D.). We disagree.

Section 954 provides in relevant part: "An accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts, . . . provided, that the court in which a case is triable, in the interest of justice and for good cause shown, may, in its discretion, order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

The law prefers consolidation or joinder of charges. (*People v. Hartsch* (2010) 49 Cal.4th 472, 493.) Because the offenses charged in this case are of the same class,

joinder is proper under section 954.  Thus, "defendant can only predicate error in the denial of severance on a clear showing of potential prejudice.  [Citations.]  We review the trial court's denial of defendant's severance motion for an abuse of discretion.  [Citation.]"  (*People v. Stanley* (2006) 39 Cal.4th 913, 934.)

" 'The determination of prejudice is necessarily dependent on the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial.'  [Citation.]  Refusal to sever may be an abuse of discretion where:  (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case.  [Citations.]"  (*People v. Sandoval* (1992) 4 Cal.4th 155, 172-173; *People v. Vines* (2011) 51 Cal.4th 830, 855.)

Here, as a preliminary matter, we note this is not a death penalty case.  Thus, the fourth criterion is inapplicable.  Turning to the first criterion, as the trial court correctly observed in denying the motion to sever, the evidence in the two cases would be cross-admissible in separate trials.  This is because each of the hypothetical separate trials would be "a criminal action in which the defendant is accused of a sexual offense," and in which Evidence Code section 1108 provides for the admission of "evidence of the defendant's commission of another sexual offense or offenses . . . if the evidence is not inadmissible pursuant to Section 352."  (See *People v. Hernandez* (2011) 200 Cal.App.4th 953, 965 ["In enacting section 1108 the Legislature recognized the 'serious and secretive nature of sex crimes and the often resulting credibility contest at trial,' and intended in sex offense cases to relax the evidentiary restraints imposed by section 1101 'to assure that the trier of fact would be made aware of the defendant's other sex offenses

7

in evaluating the victim's and the defendant's credibility' "].) Defendant does not argue on appeal that the evidence would be barred by Evidence Code section 352 and has therefore forfeited any such contention. Nor would such an argument have merit. We also note with respect to the second criterion that neither rape was unusually likely to inflame the jury against defendant.

Relying exclusively on the third criterion, defendant argues: "Joinder is unduly prejudicial in that both cases, particularly that of [C.M.], are relatively weak. There is no physical evidence supporting [C.M.'s] allegation of sexual assault and she sustained no physical injuries despite her allegation of violent assault. She was admittedly dishonest when denying to law enforcement that she was working as a prostitute at the time of the alleged assault. She has numerous prior convictions for providing false statements to authorities. Though both claims are relatively weak, [C.M.'s] is substantially weaker. As a result, the requested severance should have been granted." We are not persuaded. First, the fact C.M. had prior convictions for providing false statements to police cannot be used as a basis to claim the case against defendant with respect to Counts 1 through 3 was weak because, as we explain in part III C. of this opinion, these particular prior convictions were properly excluded from evidence. Second, and more importantly, while we acknowledge C.M. did not submit to a rape examination, lied to police about her occupation, and had prior convictions adversely affecting her credibility that were admitted into evidence, the case against defendant with respect to Counts 1 through 3 was quite strong. C.M. provided a detailed and accurate description of defendant, his tattoos, and his truck. She positively identified defendant out of a photo lineup. She did so again at trial. Moreover, defendant's rape of J.D., evidence of which was both overwhelming and cross-admissible under Evidence Code section 1108, was so similar to the rape of C.M. as to bolster her testimony the rape occurred as she claimed. Indeed, this is why the cross-admissibility "factor alone is normally sufficient to dispel any suggestion of

8

prejudice and to justify [the] trial court's refusal to sever properly joined charges."
(*People v. Soper* (2009) 45 Cal.4th 759, 775.)  There was no abuse of discretion.

## II

### *Defense Counsel's Failure to Request a Change of Venue*

Defendant also claims his defense counsel provided constitutionally deficient assistance by failing to request a change of venue due to publicity engendered by his case.  He is mistaken.

### A.

### *Additional Background*

This case generated some pretrial publicity.  According to defendant's motion for new trial, the publicity was "substantial" and the fact J.D., a minor at the time she was raped, "was incarcerated prior to trial on a material witness warrant . . . aroused much public controversy and was covered extensively in local media."  Ruling on the new trial motion, the trial court disagreed with defendant's characterization of the coverage, explaining:  "Although there was some pretrial publicity, it was not particularly extensive.  Any issue concerning knowledge of the case by any potential juror was resolved in voir dire.  There is no showing that any juror was in any way affected by any pretrial publicity.  [¶]  Counsel presenting the new trial motion has failed to present anything other than a bare assertion that trial counsel was deficient in failing to make [a change of venue] motion.  The Court finds no deficiency on the part of trial counsel."

A review of the record of voir dire supports the trial court's assessment as to the extent of the publicity.  Only three prospective jurors acknowledged hearing about the case through the media, and each expressed an understanding that only evidence presented in court could be considered.  After the jury was selected, before any evidence was presented, the trial court instructed the jury:  "You must not allow anything that happens outside of the courtroom to affect your decision.  During the trial do not read, listen to or watch any news report or commentary about the case from any source."  Two

9

days later, the trial court instructed the jury: "I wanted to re-emphasize the order that I have made that you cannot view any kind of publicity about the case; no media accounts at all, or read any media accounts, anything like that. [¶] There was an article in the Sacramento Bee. I have saved that article. At the end of the trial I will give it to you, but you may not read any articles, discuss any articles. Don't let anyone talk with you about anything they have read, seen, or heard. [¶] You all understand that? [¶] You all understand the importance of it?" The jury answered in the affirmative.

## B.

### *Analysis*

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.' [Citations.]" (*Ibid.,* quoting *United States v. DeCoster* (D.C.Cir. 1973) 487 F.2d 1197, 1202.) " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Harris* (1993) 5 Cal.4th 813, 832-833; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.)

10

Defendant has not carried his burden. A trial court "must grant a motion for change of venue if 'there is a reasonable likelihood that a fair and impartial trial cannot be had in the county.' The phrase 'reasonable likelihood' in this context 'means something less than "more probable than not,"' and 'something more than merely "possible."'" [Citation.] In ruling on such a motion, as to which defendant bears the burden of proof, the trial court considers as factors the gravity and nature of the crime, the extent and nature of the publicity, the size and nature of the community, the status of the victim, and the status of the accused. [Citations.]" (*People v. Proctor* (1992) 4 Cal.4th 499, 523 (*Proctor*).) In light of this standard, on the limited record we have before us on appeal, we cannot conclude any reasonably competent attorney would have moved for a change of venue in this case.

With respect to the gravity and nature of the charged offenses, serial rape is certainly very serious. However, these crimes are less serious than the rape, torture, and murder involved in *Proctor*, *supra*, 4 Cal.4th 499, in which our Supreme Court held a change of venue was properly denied. (*Id*. at pp. 514, 526.) With respect to the extent and nature of the publicity, we have virtually no evidence on the matter. As the party bearing the burden of proof regarding trial counsel's deficient performance, defendant should have offered evidence of the extent and nature of the publicity in his new trial motion. (*Id*. at pp. 524-525 [evidence of publicity included copies of newspaper articles, copy-notes from local television and radio broadcasts, and the results of a telephone public-opinion survey].) Without such evidence, all we have on appeal is the trial court's assessment, supported by the record of voir dire, that publicity was "not particularly extensive." With respect to the size and nature of the community, we note Sacramento County is far larger than Shasta County, in which the trial in *Proctor* took place, and as the court in that case explained: "' "The larger the local population, the more likely it is that preconceptions about the case have not become imbedded in the public consciousness." [Citation.]'" (*Id*. at p. 525, quoting *People v. Jennings* (1991) 53

11

Cal.3d 334, 363.)  Finally, on the question of the respective status of the defendant and the victims, neither defendant nor his victims were prominent members of the community.  And while this case apparently became controversial because J.D., a minor, was taken into custody on a material witness warrant, this circumstance does not make it reasonably likely a fair and impartial trial could not be had in Sacramento County.

Because defendant has not demonstrated any of the foregoing factors weighs in favor of granting a change of venue, he has failed to carry his burden of demonstrating his trial counsel acted unreasonably in declining to bring such a motion.  For the same reason, defendant has also failed to carry his burden of demonstrating prejudice.

### III

### *Challenged Evidentiary Rulings*

Defendant further asserts the trial court prejudicially abused its discretion under Evidence Code section 352 when it (a) admitted evidence defendant had a swastika tattoo on his chest, (b) admitted evidence J.D. was 16 years old at the time of the rape, and (c) excluded certain evidence of prior crimes committed by C.M. and J.D.

Evidence Code section 350 provides:  "No evidence is admissible except relevant evidence."  Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)  However, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  This provision "permits the trial judge to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption," but also "requires that the danger of these evils substantially outweighs the probative value of the evidence.  This balance is particularly delicate and critical where what is at stake is a

12

criminal defendant's liberty." (*People v. Lavergne* (1971) 4 Cal.3d 735, 744; *People v. Tran* (2011) 51 Cal.4th 1040, 1047.)

With these legal principles in mind, we now address and reject each of defendant's evidentiary assertions.

### A.

#### *Defendant's Swastika Tattoo*

Evidence of defendant's tattoos, including the swastika, was relevant to the question of his identity as the rapist. And since he decided to display his tattoos to his victims while he raped them, the fact he had a large swastika on his chest was also relevant to the question of whether he used intimidation to coerce their acquiescence. Rape may be "accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another" (§ 261, subd. (a)(2)), and " 'duress' means a direct or implied threat of force, violence, danger, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted" (*id*., subd. (b)). We acknowledge a swastika tattoo would not, in all cases, be relevant to the issue of duress. For example, if this were a date rape situation in which defendant forced himself on an unwilling girlfriend who was also a white supremacist, the fact defendant had a swastika tattoo on his chest would have little to do with whether a rape occurred. But here, particularly with respect to the rape of J.D., an African-American minor he picked up on the street and drove to a dark and relatively secluded location, the fact defendant lifted his shirt and displayed his tattoos is relevant to the question of whether defendant used an implied threat of danger sufficient to coerce a reasonable person to acquiesce in an unwanted act of sex.

Defendant does not dispute the relevance of the swastika tattoo, at least as it relates to his identity as the rapist, but argues its admission violated Evidence Code

section 352 because "the swastika tattoo was considerably and unfairly prejudicial in that it implied a potential racist 'hate crime' motivation in committing the alleged offenses," and "there was a substantial amount of other identification evidence without admitting evidence of the swastika." We disagree for two reasons.

First, a similar argument was rejected in *People v. Medina* (1995) 11 Cal.4th 694, a capital murder case in which evidence of an uncharged rape was admitted into evidence during the penalty phase of the trial. (*Id.* at p. 766.) During the guilt phase, the victim of the rape testified concerning her encounter with the defendant, leaving out the fact she was raped, in order to link the defendant to the gun and car used in the charged murder, thereby establishing his identity as the murderer. Her testimony also included a description of the defendant's tattoos, including a swastika, which was corroborated by a detective who had also observed the tattoos. Rejecting the defendant's argument the tattoo evidence "was cumulative to other [evidence] linking [him] to the car and gun, and thus it was unnecessary to admit the tattoo evidence," our Supreme Court explained: "But the weighing of probative, though possibly cumulative, evidence against its potentially prejudicial nature is a matter entrusted to the sound discretion of the trial court. [Citation.] We find no abuse of that discretion here." (*Id.* at pp. 749-750.) Similarly, here, the tattoo evidence was admitted on the issue of defendant's identity, and while cumulative of other identification evidence, it was not an abuse of the trial court's discretion to conclude it nevertheless contained probative value that was not substantially outweighed by the danger of undue prejudice.

Second, as we have explained, the tattoo evidence was relevant to establish defendant used duress in accomplishing the rape, i.e., an implied threat of danger sufficient to coerce a reasonable person to acquiesce in an unwanted act of sex. For this purpose, the tattoo evidence was highly probative, not cumulative of other evidence, and not outweighed by the danger of undue prejudice.

14

The trial court did not abuse its discretion in admitting evidence of defendant's swastika tattoo.

## B.

### *J.D.'s Age at the Time of the Rape*

In a half-page section of the opening brief, defendant argues: "Testimony regarding the age of the juvenile victim was allowed at trial over the objection of defense counsel. Specifically, the trial court allowed [J.D.] to testify that she was 16 years of age at the time of the alleged assault. [Citation.] Whatever relevance [J.D.'s] age may have had was outweighed by its prejudicial effect and its exclusion was compelled by Evidence Code [section] 352. [¶] The inclusion of [J.D.'s] age elicited sympathy for a juvenile engaged in prostitution at the same time it fostered prejudice against [defendant] as an adult taking advantage of a minor. The combined effect was one of undue prejudice in violation of [Evidence Code section] 352." This is the entirety of defendant's argument on the issue. We could consider the issue forfeited. (See Cal. Rules of Court, rule 8.204(a)(1)(B).) Defendant does not provide us with the basis upon which the trial court admitted the evidence. And while defendant cites two pages of the reporter's transcript, these are not the pages on which the trial court's ruling regarding admission of J.D.'s age appears.

Nevertheless, because the Attorney General has supplied the missing trial court ruling, we address defendant's claim on the merits. The trial court ruled: "The age of the complaining witness is an appropriate factor for the jury to consider in assessing how she conducted herself at the time of the alleged assault. Moreover, the jury is entitled to use appropriate factors in assessing the credibility of a witness. The maturity, level of sophistication, and demeanor of a witness is affected by that person's age and is a relevant factor for the jury's consideration. The jury will be instructed that they cannot use sympathy, passion, or prejudice in reaching their decision. A properly instructed jury is presumed to follow the law." We agree. Evidence of J.D.'s age at the time of the rape

15

was relevant and highly probative on the issue of her credibility as a witness. The trial court did not abuse its discretion in determining the probative value of this evidence was not substantially outweighed by the danger of undue prejudice.

## C.

### *Evidence of the Victims' Prior Crimes*

Defendant further argues the trial court prejudicially abused its discretion in excluding: (1) evidence of four of C.M.'s prior convictions (three convictions (1995, 1996, and 2000) for providing false information to law enforcement and one conviction (1995) for vehicle theft); and (2) evidence J.D. participated in a home invasion robbery of her foster parents that did not result in arrest, prosecution, or conviction. He is mistaken.

Article I, section 28, subdivision (f)(4), of the California Constitution provides in relevant part: "Any prior felony conviction of any person . . . shall subsequently be used without limitation for purposes of impeachment . . . ." In *People v. Castro* (1985) 38 Cal.3d 301, our Supreme Court held "the due process clause of the Fourteenth Amendment necessarily cuts into the 'without limitation' language of subdivision (f)" (*Castro, supra,* at p. 314), explaining: "[W]e must ask with respect to any particular felony conviction which is offered for impeachment: 'Can it be said with substantial assurance that the credibility of a witness is adversely affected by his [or her] having suffered this conviction?' If the answer is 'no,' impeachment is prohibited by due process: 'An important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence.' [Citation.]" (*Id.* at p. 313.) The answer will be "yes" only where the conviction is for a crime involving moral turpitude, i.e., a crime that "indicates a 'bad character' and 'general readiness to do evil.' " (*Id.* at p. 315.) "Obviously it is easier to infer that a witness is lying if the felony of which he [or she] has been convicted involves dishonesty as a necessary element," but there is also "some basis—however tenuous—for inferring that a person who has committed a crime which involves moral turpitude other than dishonesty is more likely to

16

be dishonest than a witness about whom no such thing is known." (*Ibid.*) In *People v. Wheeler* (1992) 4 Cal.4th 284, our Supreme Court "abrogated the felony-only rule and permitted misdemeanors to be used to impeach. However, the threshold inquiry remains whether the prior conduct has some logical bearing upon the witness's veracity." (*People v. Chavez* (2000) 84 Cal.App.4th 25, 28.)

Moreover, the trial court retains discretion under Evidence Code section 352 to exclude prior conviction evidence where the "probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; *Castro*, *supra*, 38 Cal.3d at p. 306.) Where, as here, "the witness subject to impeachment is not the defendant," exercise of the trial court's discretion should include consideration of two prominent factors: "whether the conviction (1) reflects on honesty and (2) is near in time." (*People v. Clair* (1992) 2 Cal.4th 629, 654.)

Here, the trial court allowed defendant to impeach C.M. with a 2009 conviction for petty theft and a 2011 conviction for loitering for purposes of prostitution, but excluded the above-mentioned 1995, 1996, and 2000 convictions under Evidence Code section 352, explaining: "They are remote in time, from 11 to 16 years, from the date of the offense charged in this case. Further, there is a nine year gap between the 2000 misdemeanor conviction and the 2009 misdemeanor conviction. The Court finds this dated conduct would not assist the jury in determining [veracity]." There was no abuse of discretion. While C.M.'s prior convictions for providing false information and vehicle theft involved dishonesty (*People v. Steele* (2000) 83 Cal.App.4th 212, 222 [providing false information to a peace officer adversely affects credibility]; *People v. Mendoza* (2000) 78 Cal.App.4th 918, 925 [theft-related crimes adversely affect credibility]), the trial court acted within its discretion in determining these crimes were remote. Moreover, admission of evidence of C.M.'s more recent convictions, one of which was also for a

theft-related offense, prevented her from receiving "a ' "false aura of veracity." ' "
(*People v. Hinton* (2006) 37 Cal.4th 839, 888.)

With respect to J.D., the trial court allowed impeachment with a 2009 conviction for petty theft. The trial court also allowed defendant to impeach J.D. with her actions the night she was arrested on a material witness warrant prior to trial. With respect to the excluded evidence that J.D. participated in a home invasion robbery of her foster parents (and other purported conduct not leading to conviction, the exclusion of which is not challenged on appeal), the trial court explained: "These allegations have not been subject to the rigors of judicial process. Conducting mini-trials within this trial on collateral and irrelevant or marginally relevant allegations would result in an undue consumption of time, would not meaningfully assist the jury in determining [veracity], and would have a tendency to [confuse] the issues." This ruling was also within the trial court's discretion. "Additional considerations apply when the proffered impeachment evidence is misconduct other than a prior conviction. This is because such misconduct generally is less probative of immoral character or dishonesty and may involve problems involving proof, unfair surprise, and the evaluation of moral turpitude. [Citation.] . . . '[C]ourts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value.' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 931-932.) While robbery is a crime of moral turpitude involving dishonesty (*People v. Stewart* (1985) 171 Cal.App.3d 59, 63-64), the trial court was within its discretion in concluding a mini-trial on the question of whether J.D. was actually involved in committing such a crime would have consumed an undue amount of time and created a substantial danger of confusing the issues.

## IV

### *Denial of the Motion to Dismiss Juror No. 7*

We also reject defendant's contention the trial court prejudicially erred when it denied his motion to dismiss Juror No. 7 after the juror acknowledged he lived in the same neighborhood as a prosecution witness.

### A.

### *Additional Background*

On May 3, 2012, Detective James Hoehn of the Sacramento County Sheriff's Department testified for the prosecution. The next day of trial, May 15, 2012, the trial court noted it had "received information from [the prosecutor] that he was contacted by Detective Hoehn, who indicated that [Juror No. 7] contacted him after trial because he realized that he recognized . . . Detective Hoehn as a neighbor, asked what he should do because he did not recognize the name on the witness list. [¶] Detective Hoehn contacted [the prosecutor], who advised Court and counsel."

The trial court then called Juror No. 7 into the courtroom for questioning. The juror explained: "Well, I'm terrible with names. I remember faces. I haven't lived in the neighborhood that long, so when I saw [Detective Hoehn] I recognized him. And then we kind of caught up with each other, and I said what do we do, and he goes, I got to call them and let them know, you know, we know each other, and --" The trial court asked how the juror "caught up" with the detective. Juror No. 7 explained Detective Hoehn came over to his house, knocked on the door, and said: "I was testifying, and I thought I recognized you as a juror. Are you a juror?" Juror No. 7 answered he was. The detective responded: "Well, I got to call them and let them know." There was no further conversation about the case. Juror No. 7 denied having any relationship with Detective Hoehn, other than recognizing him from the neighborhood, and stated recognizing him as a neighbor would in no way affect the juror's ability to be fair and impartial. After a brief sidebar, the trial court asked whether Juror No. 7 had gone to Detective Hoehn's

19

house prior to the detective's arrival at his house. Juror No. 7 acknowledged he went to the detective's house to bring up the fact he recognized him, but when no one answered the door, the juror returned to his house. Detective Hoehn arrived at his house a short time later.

Defense counsel asked the trial court to dismiss Juror No. 7, noting the prosecutor's e-mail advising him of the contact between Detective Hoehn and Juror No. 7 indicated there had been "five or six times" in which the detective and the juror had spoken while living in the same neighborhood. Defense counsel argued: "I think that there is some relationship between the juror and the prosecution witness. I think that the juror was somewhat cagey in indicating that the detective had come to his house and originally omitting that he himself had gone to the detective's house first. [¶] I think there's no reason to have on the jury somebody who has some relationship with a prosecution witness. Although they don't seem to be friends, they do seem to be acquaintances, and for those reasons I don't think it's appropriate to have him as a juror."

In response, the prosecutor argued: "Your Honor, neither the detective [nor] the juror indicated they have any relationship other than they are neighbors and live a number of houses away. [¶] I'd also like to note that I would not agree that the juror was being cagey in any fashion. It just seemed to me the juror was unclear as to why the detective might have come and knocked on his door. [¶] As I indicated at sidebar and may have also indicated by email, the detective told me that he heard a knock on his door. He didn't answer the door as is his custom, but he did look out the window. He saw this man walking back to his house. At that point he put two and two together. Thought, well, now, I know why I recognize that juror in court. [¶] He went down to this man's house to see what it is he wanted, and that's how the contact occurred. So I don't believe there's anything cagey on the part of this juror. I think he might not have known exactly the circumstances under which the detective came to his door; in other words, I don't think he knew the detective saw him walking back from his house."

20

The trial court ruled: "I think this juror has been very straightforward. He did not recognize the name, has no social relationship at all. When he realized he thought he might recognize him, he did what he thought he was supposed to do, and Detective Hoehn did what he thought he was supposed to do. They both realized that this is something that should be brought to the Court's attention. They did so. [¶] This juror indicated they have no social relationship. They don't really know each other that well, very casual and, certainly, there's nothing in the Court's opinion that causes the Court to believe that this juror should be replaced. He has done nothing wrong. He has not violated any admonition or in any way -- acted in any way that the Court finds that he did not discharge his duties or would not continue to discharge his duties."

**B.**

*Analysis*

Section 1089 gives the trial court the authority to discharge a juror who, upon good cause shown, is found to be unable to perform his or her duty. "The determination of 'good cause' in this context is one calling for the exercise of the court's discretion; and if there is any substantial evidence supporting that decision, it will be upheld on appeal. [Citations.] A juror's inability to perform his or her functions, however, must appear in the record as a 'demonstrable reality' and bias may not be presumed. [Citations.]" (*People v. Thomas* (1990) 218 Cal.App.3d 1477, 1484; *People v. Beeler* (1995) 9 Cal.4th 953, 975, abrogated on another point as stated in *People v. Pearson* (2013) 56 Cal.4th 393, 461-462.)

Here, the record reflects no demonstrable reality Juror No. 7 was unable to perform his duties as a juror. In response to the trial court's questioning, he explained his relationship with Detective Hoehn was virtually nonexistent. They lived in the same neighborhood, but had no social relationship. Juror No. 7 stated nothing about Detective Hoehn's status as a neighbor would affect his ability to be fair and impartial. The trial court found Juror No. 7's responses regarding his relationship with Detective Hoehn to be

21

credible. We are bound by this credibility determination. (See *People v. Salcido* (2008) 44 Cal.4th 93, 133 [analogous situation of a for-cause challenge to a prospective juror; "such a determination involves an assessment of a prospective juror's demeanor and credibility that is ' "peculiarly within a trial judge's province" ' "].) In these circumstances, the trial court was within its discretion not to remove Juror No. 7 from the jury.

Nor are we persuaded by defendant's reliance on *People v. Hecker* (1990) 219 Cal.App.3d 1238, a case in which the Court of Appeal affirmed the trial court's decision to remove a juror after she informed the court the defendant came to her church the previous weekend and became a member. In response to questioning, the juror "was unable to give any assurance that she could decide the case without reference to her experience seeing [the defendant] join her church. 'I think it would bother me. I would be thinking about that, too,' she admitted." (*Id*. at pp. 1244-1245.) The appellate court held the record indicated, as a demonstrable reality, the juror was unable to perform her duty within the meaning of section 1089, explaining: "An admission by a juror that there is a significant likelihood extraneous matters will enter into the decisionmaking process is, in our view, sufficient to warrant removal of the juror and substitution of an alternate." (*Id*. at p. 1245.) Here, there is no such admission. As we have already explained, Juror No. 7 stated unequivocally Detective Hoehn's status as a neighbor would not affect his ability to be fair and impartial.

Defendant also takes issue with the way the matter was brought to the trial court's attention. He argues: "Instead of contacting Detective Hoehn at his home and engaging in the out of court private conversation, Juror [No.] 7 should have immediately contacted the court's bailiff at the very moment (during the in court proceedings) when the juror recognized that he knew Detective Hoehn. Likewise, Detective Hoehn should have immediately notified either the bailiff or the prosecuting attorney as soon as he realized that Juror [No.] 7 looked familiar. Further, Detective Hoehn (a trained law enforcement

witness) should have refused to engage in any discussion with Juror [No.] 7 and simply directed the juror to contact the court." While defendant's suggestions as to a more appropriate manner of bringing the matter to the trial court's attention have some merit, the question on appeal is whether the record reflects, as a demonstrable reality, that Juror No. 7 was unable to perform his duties as a juror. For reasons already expressed, it does not. There was no abuse of discretion.

## V

### *Purported Juror Misconduct*

Nor do we accept defendant's unsupported assertion the jury did not begin its deliberations anew after Juror No. 10 was removed and replaced by an alternate juror.

There is no question as to the propriety of the juror substitution, to which both parties agreed. After the substitution, the trial court expressly instructed the jury, in accordance with *People v. Collins* (1976) 17 Cal.3d 687 (*Collins*): "One of your fellow jurors has been excused, and an alternate juror has been selected to join the jury. Do not consider this substitution for any purpose. [¶] The alternate juror must participate fully in the deliberations that lead to any verdict. The People and the defendant have the right to a verdict reached only after full participation of the [jurors] whose vote determines that verdict. This right will only be assured if you begin your deliberations again from the beginning. Therefore, you must set aside and disregard all past deliberations and begin your deliberations all over again. Each of you must disregard the earlier deliberations and decide this case as if those earlier deliberations had not taken place." The newly-constituted jury retired to the deliberation room and reached their verdict in 1 hour and 43 minutes.

"In the absence of evidence to the contrary, a jury is presumed to have complied with the instructions given to it." (*People v. Crow* (1994) 28 Cal.App.4th 440, 446.) Here, the jury was specifically instructed to begin its deliberations anew. The only evidence defendant offers in support of his assertion the jury disregarded this instruction

is the fact "the reconstituted jury reached a verdict in just one hour and forty-three minutes." From this, defendant argues "it is highly implausible deliberation began anew as required after the [substitution] and thus [defendant's] constitutional right to trial by jury was impinged according to [*Collins*, *supra*, 17 Cal.3d 687]." In light of the evidence of defendant's guilt, we see nothing implausible about the jury reaching a swift decision while adhering to the trial court's instruction to begin its deliberations anew.

## VI

### *No Response to Jury Request No. 3*

Finally, defendant contends the trial court prejudicially erred when it did not respond to a jury question (Jury Request No. 3) that was received before the juror substitution. Not so. As defendant himself points out in his previous argument, the jury was required to begin its deliberations anew after the substitution. Because of this, the trial court explained to the jury: "[Y]ou had sent a note out. The response is not going to be sent back because you need to start completely anew. So if you have some further request or request for testimony or any question, that would have to come from the newly-constituted jury. So that's why you're not receiving a response to your prior note." Thereafter, the jury submitted a new jury question (Jury Request No. 4), which the trial court appropriately answered. Defendant cites no authority, nor have we found any on our own, requiring the trial court to answer a jury question submitted prior to a juror substitution. To so hold would run contrary to the requirement the jury must begin its deliberations anew following such a substitution.

## VII

### *Error in the Abstract of Judgment*

We must, however, direct correction of a clerical error in the abstract of judgment. The abstract of judgment erroneously refers to defendant's convictions for unlawful sexual penetration as violations of section 288, rather than section 289. We direct the

24

trial court to correct the abstract of judgment to reflect that Counts 2 and 3 are violations of section 289, subdivision (a)(1).

## DISPOSITION

The judgment is affirmed. The trial court is directed to correct the abstract of judgment to reflect that Counts 2 and 3 are violations of Penal Code section 289, subdivision (a)(1), and to forward a certified copy of the corrected abstract to the Department of Corrections and Rehabilitation.


                                             HOCH            , J.


We concur:


RAYE     , P. J.


BLEASE   , J.

25